USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10|26|18

SHADIA ALVAREZ,

                              Plaintiff,

                -v-

CARRON STAPLE,

                              Defendant.

17 Civ. 935 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves claims by a public school principal in New York City that she was

retaliated against for her constitutionally protected speech, in violation of the First Amendment.

Plaintiff Shadia Alvarez, former Interim Acting Principal of the Collegiate Institute for Math and

Science ("CIMS"), brings this action under 42 U.S.C. § 1983 against Carron Staple, a

superintendent of the Department of Education of the City of New York ("DOE") assigned to

CIMS. Alvarez claims that Staple retaliated against her because of complaints Alvarez had made

to the New York Police Department ("NYPD") and other agencies regarding safety at CIMS, and

that this retaliation culminated in DOE's termination of Alvarez's tenure as Interim Acting

Principal.

With discovery complete, Staple has moved on multiple grounds for summary judgment.

For the following reasons, the Court grants that motion.

I.     **Background**

By way of overview, Alvarez, who had tenure as an assistant principal, was appointed

Interim Acting Principal of CIMS on January 1, 2012, serving on a probationary basis. Staple

became the DOE superintendent assigned to supervise CIMS in October 2012. Both before and

after Staple's appointment, Alvarez complained about school safety, often speaking in tandem with principals from four sister schools. These complaints culminated in a meeting on April 12, 2013 called by Staple to discuss safety problems at these schools. In the following months, Staple was advised of discrepancies in Alvarez's timesheets to DOE, resulting in a formal investigation into alleged theft of services which was undertaken by DOE's Office of Special Investigations ("OSI"). In March 2014, with OSI's investigation ongoing, Staple recommended that Alvarez's probationary status, which had been scheduled to end on July 2014, be continued. In June 2014, after OSI issued a report finding material falsehoods on her timesheets, Staple changed her recommendation. Consistent with Staple's now-unfavorable recommendation, DOE thereafter denied Alvarez's certificate of completion of probation. Alvarez reverted to her underlying tenured position as an assistant principal, and later voluntarily resigned.

In this lawsuit, Alvarez alleges: (1) that the complaints she made were protected speech under the First Amendment and (2) that Staple's actions referring Alvarez's timesheets for investigation and later recommending the termination of her probationary status were acts of retaliation for that speech. Staple counters that Alvarez's complaints were not protected speech, but instead were employee speech within the scope of her job responsibilities. Independently, Staple argues that the evidence does not permit a finding that Alvarez's speech caused these adverse actions. She contends that she reported Alvarez to OSI in good faith and not as a result of Alvarez's safety complaints, and that OSI's findings of theft of services were the sole, and a proper, basis for her decision to change her recommendation as to Alvarez's probationary status.

## A. Factual Background[1]

### 1. Alvarez's Employment with DOE: Key Dates

DOE employed Alvarez between 1998 and August 2015. Def. 56.1 ¶ 1. On or about January 1, 2012, Alvarez was appointed Interim Acting Principal of CIMS in the Bronx. JSF ¶ 1. CIMS was one of seven distinct schools that, during the period relevant to this case, comprised the Christopher Columbus Campus in the Bronx, New York. *Id.* ¶ 3. In October 2012, Staple became the DOE Superintendent assigned to Alvarez's school. *Id.* ¶ 4.

Alvarez's appointment was subject to a probationary period, which was scheduled to conclude on July 1, 2014. *Id.* ¶ 2. On June 24, 2014, the Office of the Senior Supervising Superintendent sent Staple and other pertinent parties a formal notification through DOE's electronic Tenure Notification System ("TNS") that the Office had denied Alvarez's probation. Def. 56.1 ¶ 31. By letter dated June 25, 2014, Staple formally informed Alvarez of her

---

[1] The Court draws its account of the underlying facts from: the parties' respective submissions on the motion for summary judgment, including defendant's Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 60 ("Def. 56.1"), and plaintiff's counter-statement, *see* Dkt. 66 ("Pl. Counter 56.1"); the Declaration of John C. Carter in support of defendant's motion, Dkt. 58 ("Carter Decl."), and attached exhibits; the Declaration of Carron Staple in support of defendant's motion, Dkt. 59 ("Staple Decl."), and attached exhibits; the Declaration of Natalia Kapitonova in support of plaintiff's opposition, Dkt. 65 ("Kapitonova Decl."), and attached exhibits; the Declaration of Shadia Alvarez in support of plaintiff's opposition, Dkt. 67 ("Alvarez Decl."); the parties' joint statement of undisputed facts, Dkt. 54 ("JSF"); and Shadia Alvarez's deposition transcript, of which this Court requested a full copy, Dkt. 74-1 ("Alvarez Dep.").

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

probationary discontinuance. *Id.* ¶ 32. Alvarez submitted an appeal of her probationary denial to

DOE's Office of Appeals and Review in accordance with the provisions of Section 4.3.2 of the

DOE Bylaws. *Id.* ¶ 34.

On or about July 1, 2014, Alvarez reverted to her underlying tenured position of Assistant

Principal with DOE. JSF ¶ 11. Alvarez voluntarily resigned from DOE service effective August

1, 2015. *Id.* ¶ 12.

### 2. Alvarez's Responsibilities With Respect to School Safety

Alvarez's job responsibilities as Acting Principal included communicating with the

NYPD about certain safety issues. Pl. Counter 56.1 ¶ 6. Per an agreement between DOE and

NYPD enacted in 1998, the NYPD and its School Safety Division select, train, deploy, manage,

and evaluate DOE school safety personnel. Def. 56.1 ¶ 8. During her time at CIMS, Alvarez

was responsible for routinely interacting with the school safety personnel who served at the

school regarding safety and security issues, as well as with DOE's Office of Safety and Youth

Development. *Id.* ¶ 7.

Pursuant to Chancellor's Regulation A-414, the "school community" is responsible for

"engag[ing] in meaningful ongoing dialogue and collaboration to ensure safe schools." Carter

Decl. Ex. D (DOE Chancellor's Regulation A-414). The "school community" is defined to

include "administrators, staff, students, parents, [and] the NYPD . . . ." *Id.* As Acting Principal

of CIMS, Alvarez was responsible for sitting on her building's school safety committee, which

was required to formulate and submit a school safety plan for NYPD certification. Def. 56.1

¶ 10. Alvarez, together with four other principals, prepared a school safety plan in 2013.[2]

---

[2] Although of no consequence to this decision, the record leaves unclear which of two documents
described by Alvarez in her deposition was the formal campus safety plan. *Compare* Alvarez
Dep. at 98–99 (testifying as follows about a document marked there as Exhibit D: "Q: Under the

Alvarez attests that this document was given to "Staple, Deputy Chancellor, New Vision for Public School . . . , Commanding Officer Quinn, and the Leadership Academy." Alvarez Decl. ¶ 14.

### 3. Overview of Alvarez's Complaints About School Safety

In her declaration submitted in opposition to summary judgment, Alvarez identifies two complaints about school safety that she claims to have made in 2012, the first year she served as Acting Principal. On January 12, 2012, prior to Staple's appointment, Alvarez states, she complained to "Sg[t.] Albino, Lt. Silitides . . . , XO Talle [and Commanding Officer] Quinn." Alvarez Decl. ¶ 11. Later, on November 28, 2012, Alvarez claims, she drafted a letter to "Director Garcia, XO Talle [and] Supervisor Rivera," *id.* ¶ 16, about "concerns that student were being arrested without due process," that security responses by safety personnel were inadequate, and "that there was difficulty communicating in emergency situations," *id.* ¶ 15.[3]

In her deposition, Alvarez identified the safety complaints she made in 2013. Between January 2013 and the summer of 2013, Alvarez and five other principals complained about school safety to various people Alvarez described as "external" to DOE. Alvarez Dep. at 130 ("Q: So in what instance did you go external? A: When I started feeling that I could not count on

---

header, why are we here, it says, [i]t is a primary building counsel responsibilit[y] to design and implement a plan to ensure campus safety . . . . So this document is the plan? A: Yes") *with* Alvarez Dep. at 154–56 (testifying that a document entitled "Campus safety needs and how to address them," was drafted in March 2013 and "l[e]d to" Exhibit D, and was "similar to" Exhibit D). Alvarez's testimony about the existence of such a plan by March 2013 seemingly conflicts with Staple's assertion in a letter to her supervisor reporting "the failure of the campus committee to submit a safety plan" and noting the need for a safety plan to be "signed off on and submitted by Friday, April 19, 2013." Carter Decl. Ex. H at 3. It is, however, undisputed that Alvarez and her committee submitted a safety plan at some point in 2013.

[3] It does not appear that Alvarez, in her deposition in this case, referenced these 2012 complaints. Defendants do not, however, seek to strike this aspect of Alvarez's declaration, nor point to any deposition question to which the fact of these complaints was necessarily responsive.

the protection of my superintendent . . . . Q: About what time? A: . . . Everything from January 2013 to the end of that summer."). An early complaint was made to Ramon Garcia, an NYPD deputy in the School Safety Division, regarding a school safety officer's lack of responsiveness. *Id.* at 130–31. After that safety officer was removed, safety concerns remained, and Alvarez and the principals complained variously to Executive Officer Talle, Garcia, and Lieutenant Silitides, all part of the NYPD's School Safety Division or Department of Internal Affairs. *Id.* at 131–33. Alvarez believes that Staple was copied on most of these complaints. *Id.* at 134–35.

Alvarez in her declaration describes the contents of the principals' safety complaints to these NYPD officials. The principals complained of "threats towards Principals"; "safety issues in the building"; "students . . . being arrested without due process, that only 2 out of the 7 principal's [sic] in the building were getting security responses and that there was difficulty in communicating in emergency situations"; "fires in the stairwell, serious criminal threats [to] my staff and I"; and "death threats in the form of anonymous phone calls to my private cell-phone and office." Alvarez Decl. ¶¶ 12, 14–15, 17–18.[4]

Alvarez did not, however, communicate any safety concerns to The Leadership Academy, an education non-profit, at any time. Nor, until after her discontinuance as Acting Principal, did Alvarez communicate such concerns to her union, the Council for Supervisors and Administrators ("CSA"). Def. 56.1 ¶¶ 14–15.

---

[4] Alvarez testified she last complained to the NYPD in May 2014 in connection with a specific incident regarding another principal and threats made to Alvarez by students. However, she testified that she does not believe Staple was upset about that complaint. *See* Alvarez Dep. at 153–54.

### 4. The April 2013 Letter to the DOE Deputy Chancellor

In April 2013, Alvarez and four other Columbus Campus principals—Julie Nariman, Carlos Santiago, Sandra Burgos, and Carolyne Quintana—jointly communicated intra-campus safety concerns to DOE Deputy Chancellor Shael Suransky, first orally, and then in writing. Pl. Counter 56.1 ¶ 12. The five principals originally approached Suransky and he scheduled a meeting with them. Alvarez Dep. at 67–68. During this meeting, the attendees jointly created a document regarding "The Columbus Five, the new Columbus," which "outlined everything we wanted that campus to be and everything we knew it could be." *Id.* at 68. Suransky stated he would get in touch with Staple to give the principals additional support. *Id.*

### 5. The April 12, 2013 Meeting With Staple

On April 12, 2013, Staple visited the Columbus Campus and met with all seven Columbus Campus principals, including Alvarez. Pl. Counter 56.1 ¶ 17; *see also* Def. 56.1 ¶ 17. Alvarez believes that Staple called this meeting in response to the five principals' meeting with Suransky, and included "every single office that you can imagine." Alvarez Dep. at 68. Alvarez recalled that numerous persons attended the meeting: "[Terry Byam, Executive Director of Campus Governance] was there, Vincent [DiGaetano, Regional Safety Administrator for the Columbus Campus] was there, level three security [school safety officers] was there, Bronx Command East [the equivalent of the precinct for the district safety officers] was there, every single principal and the[ir] representative was there." *Id.*[5]

---

[5] In a letter dated April 15, 2013, Staple reported to her Senior Supervising Superintendent Donald Conyers as to the meeting. Carter Decl. Ex. H. The letter describes the attendees as "Terry Byam, Executive Director of Campus Governance, . . . Harmon Unger, Deputy CEO for Safety and Discipline, Frank Pagliuca, OSYD [Office of Safety and Youth Development] Consultant for the Campus, . . . Vincent Digaetano, Regional Safety Administrator for the Columbus Campus, . . . . all of the principals and their network leaders, . . . Commanding Officer

Alvarez claims that during the April 2013 meeting, Staple complained that "she was having this meeting because somebody went over [Staple's] head . . . and they're making me look like I'm not doing my job." *Id.* at 68–69.

### 6. The OSI Investigation Into Alvarez's Timesheet Discrepancies

On May 2, 2013, Alvarez submitted per session payment requests to Staple for her approval. Def. 56.1 ¶ 18. Such requests are for "any activity outside of an employee's primary assignment and work hours, for which pedagogic employees are paid at an hourly rate." Staple Decl. Ex. C at 1 n.2 ("OSI Investigative Report"). Staple observed discrepancies on Alvarez's timesheets. Def. 56.1 ¶ 19.[6] On May 3, 2013, Staple reported these discrepancies to her supervisor, Donald Conyers, Senior Supervising Superintendent. *Id.* ¶ 20. Conyers instructed Staple to report the matter to DOE's Special Commissioner of Investigation ("SCI"); Staple did so that same day. *Id.*

On or about May 13, 2013, OSI received a referral complaint alleging that Alvarez had committed theft of service through per session payments. JSF ¶ 6. Between May 2013 and January 2014, OSI conducted an investigation into those claims. *Id.* ¶ 7. OSI interviewed Alvarez during its investigation. OSI Investigative Report at 4.[7]

OSI substantiated the claims against Alvarez and memorialized its findings in a report dated January 10, 2014. JSF ¶ 9. OSI's Report concluded that Alvarez had committed employee

---

Gerome Quinn from Bronx Command East, the school's dietician, and the Level III, Sgt. Palo Martinez." *Id.* at 1–2.

[6] The parties dispute whether Staple at the time believed that these discrepancies represented attempted theft of service by Alvarez, Def. 56.1 ¶ 19, or merely clerical errors by Alvarez, Pl. Counter 56.1 ¶ 19. That Staple observed such discrepancies appears undisputed.

[7] Alvarez does not appear to deny that she was interviewed. Pl. Counter 56.1 ¶ 22.

misconduct by requesting and receiving pay for time she had not worked. OSI Investigative Report at 5. The periods covered by the improper requests included multiple days in October 2012, when all DOE schools were closed during Hurricane Sandy and two days in December 2013, when Alvarez had used sick leave. *Id.* at 3. The Report also found that Alvarez had failed to follow DOE Chancellor's Regulation C-175 requiring that she document her per session activity using a timecard. *Id.* at 3.[8] The OSI Report was not then shared with Alvarez or Staple. Def. 56.1 ¶ 25.[9]

### 7. Staple's Recommendations Regarding Alvarez's Probation

As part of her duties as Superintendent, Staple was (and is) responsible for making recommendations to the Office of the Supervising Superintendent regarding probationary principals' completion of probation. *Id.* ¶ 26. On March 31, 2014, after conducting an end-of-probation visit at Alvarez's school, Staple submitted a favorable formal recommendation for Alvarez's completion of probation on TNS. *Id.* ¶ 28.

On June 10, 2014, Staple (and Alvarez) received the OSI Investigative Report. *Id.* ¶ 29.[10] After receiving the Report, certain DOE employees directed Staple to change her earlier

---

[8] Alvarez disputes various findings of the Report but not that the Report made such findings. Pl. Counter 56.1 ¶¶ 23–24.

[9] Alvarez disputes that the Report was not shared with Staple, stating that "Staple knew what the outcome of the report will be [sic] as she prepared the accusations to frame Plaintiff." Pl. Counter 56.1 ¶ 25. Regardless whether Staple foresaw the Report's outcome, Alvarez has not pointed to any admissible evidence that Staple received the Report or learned of its findings before June 2014.

[10] Alvarez denies knowledge of the specific date when Staple received the Report, but has not pointed to any evidence disputing that Staple first received it on June 10, 2014. Pl. Counter 56.1 ¶ 29.

recommendation as to Alvarez's probation,[11] and, on June 12, 2014, she submitted a formal

reversal of her recommendation to TNS. *Id.* ¶ 30. Staple's reversal stated: "Ms. Shadia Alvarez

has a substantiated OSI case that warrants her denial of probation and license revocation." *Id.*

   Staple's motivations in reporting Alvarez's timesheet discrepancies to her supervisor,

leading to the OSI investigation, are a central area of dispute. Staple states that the only reason

she reported Alvarez to OSI was out of a genuine belief that a theft of service had occurred. *Id.*

¶¶ 19–20. Alvarez contends that Staple knew that the inconsistencies in her timesheet were mere

clerical error, and that she reported them to OSI as a pretext to remove Alvarez from her

position. *See* Pl. Counter 56.1 ¶¶ 19–28. Alvarez claims that Staple in fact was motivated by her

anger at complaints Alvarez had made regarding school safety to DOE's Deputy Chancellor and

to the NYPD.[12] Staple counters that she had been unaware of any complaints by Alvarez to any

external entity about school safety concerns. Def. 56.1 ¶ 16.

---

[11] Staple states that she acted at the direction of "her supervisor and others." Def. 56.1 ¶ 30.
Alvarez admits only that Staple was instructed "by the DOE attorney and others." Pl. Counter
56.1 ¶ 30.

[12] Alvarez has articulated in varying terms her theory as to the source of Staple's impulse to
retaliate. In her memorandum of law opposing the instant motion, Alvarez states that Staple was
upset "particularly [by Alvarez] complaining to the New York City Police Department," Pl.
Mem. at 5, but also states that Staple acted in retaliation for Alvarez's role in the five principals'
outreach to Suransky, *id.* at 5–6. In Alvarez's deposition, she stated that Staple was mainly upset
about the communication to Suransky. Alvarez Dep. at 135 ("Q: So which communication,
which complaint do you think that Superintendent Staple was upset about? A: The April 1st
when we went to Deputy Chancellor Suransky. . . . Q: You think she was upset about other
complaints or mainly that one? A: I think the other one's [sic] did not directly impact her. I
think that one directly impacted her. He was her superior."); *see also id.* at 154 ("Q: Do you
think [Staple] would have reason to be upset about that May 2014 complaint [to the NYPD]?
A: Office of Safety and the New York City Police Department are not directly connected to her.
Q: So no? A: So no.").

Elsewhere in her deposition, Alvarez testified that other people told her Staple was "extremely
upset" about police department complaints. However, it is unclear whether Alvarez believes
Staple was upset about the complaints themselves or the fact that they led to the April 2013

As to treatment of potential comparators, Staple recommended completion of probation for all other probationary principals who, alongside Alvarez, had jointly complained to Deputy Chancellor Suransky about school safety. *Id.* ¶ 36.[13] Staple has recommended the discontinuance of probation for other principals, including where an OSI investigation found improprieties involving that principal. *Id.* ¶ 27.[14]

## B. Procedural History

On October 17, 2016, Alvarez filed a complaint in New York State Supreme Court against Staple and DOE, alleging retaliation for protected activity under the First Amendment. *See* Dkt. 1 (Notice of Removal). On February 8, 2017, Staple and DOE removed this case to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. *See id.*

On March 17, 2017, DOE moved to dismiss. Dkts. 6–7. On April 7, 2017, Alvarez filed an Amended Complaint. Dkt. 15 ("Am. Compl."). On April 28, 2017, DOE filed a motion to dismiss the Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and as, in part, time-barred. Dkts. 21–23. On May 15, 2017, this Court granted Staple leave to join

---

meeting. *Id.* at 159. In any case, Alvarez does not point to any non-hearsay evidence of Staple's ostensible discontent. *See id.* at 159–60 ("Q: Other than other people's hearsay statements, do you have any other evidence that Superintendent Staple was extremely upset about police department complaints? A: Not directly, not to me.").

[13] Alvarez denies paragraph 36 of Defendant's Rule 56.1 statement, but appears instead to be responding to paragraph 35, as Alvarez there discusses "a hearing she did not know it existed [sic] nor was notified to go to." Pl. Counter 56.1 ¶ 36. Alvarez has not identified any evidence countering Staple's evidence that Staple recommended completion of probation for the other probationary principals. On the contrary, in her deposition, Alvarez appeared aware that Staple had approved the other principals. Alvarez Dep. at 142–43 ("Q: Did Superintendent Staple have the ability to approve or deny their probation? A: Yes, sir. Q: Did she approve or deny Cantano? A: I believe that they were all approved after I was removed. . . . Q: You were the only one that was removed after your probationary period of those five? A: Yes.").

[14] Alvarez denies paragraph 27 of Defendant's Rule 56.1 statement but does not point to any admissible evidence countering the substantiated facts therein.

11

DOE's motion to dismiss. Dkt. 28. On May 22, 2017, Alvarez filed an opposition. Dkt. 29. On June 15, 2017, this Court heard argument on the motion to dismiss and, from the bench, granted the motion to dismiss in part and denied it in part. Dkt. 30. The Court dismissed Alvarez's claims regarding adverse employment actions before November 9, 2013, as time-barred, and dismissed all Alvarez's claims against DOE. *Id.* On June 29, 2017, Staple, the only remaining defendant, answered. Dkt. 15.

On March 13, 2018, the parties filed a joint statement of undisputed facts. Dkt. 54. On April 9, 2018, Staple filed a motion for summary judgment, Dkt. 57, the Carter Declaration, Dkt. 58, the Staple Declaration, Dkt. 59, an accompanying memorandum of law, Dkt. 61 ("Def. Mem."), and Staple's Rule 56.1 statement, Dkt. 60. On May 5, 2018, Alvarez submitted her opposition brief, Dkt. 68 ("Pl. Mem."), the Kapitonova Declaration, Dkt. 65, the Alvarez Declaration, Dkt. 67, and her counter-statement to Staple's Rule 56.1 statement, Dkt. 66. On May 23, 2018, Staple submitted her reply brief. Dkt. 71 ("Def. Reply").

## II. Discussion

Staple pursues summary judgment on multiple grounds. She argues that the facts not materially in dispute demonstrate: (1) Alvarez's speech was not constitutionally protected because she spoke as a public employee, not as a citizen; (2) Alvarez's speech was not protected because her speech regarded personal matters, not matters of public concern; (3) even if Alvarez's speech were protected, the facts do not permit a jury to find, non-speculatively, a causal connection between her speech and the adverse action she alleges (denial of completion of her probation and consequent loss of her position as an acting interim principal); and (4) in any case, Staple is entitled to qualified immunity. To grant summary judgment, the Court need resolve only the first argument. Viewing the facts in the light most favorable to Alvarez, her

speech—which centered on matters of school safety—fell squarely within her official duties as an acting school principal and therefore was not protected under the First Amendment. Because this holding is fatal to Alvarez's claim, the Court need not reach Staple's alternative arguments.

## A. Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 US. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d

Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

### B.    Legal Standards Governing A First Amendment Retaliation Claim

To prevail on a First Amendment retaliation claim, a plaintiff must establish that "(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

To determine whether a public employee's speech is protected, a court must conduct a two-step inquiry. *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). The first step involves "determining whether the employee spoke as a citizen on a matter of public concern." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). To determine whether a public employee spoke as a citizen, a court asks: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Id.* at 173 (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203–04 (2d Cir. 2010).[15]

If the employee did not speak as a citizen on a matter of public concern, the inquiry ends—the speech was not constitutionally protected. *See id.* at 172. Otherwise, the court proceeds to the second step (known as the "*Pickering* analysis"). *See Pickering v Bd. of Educ.*, 391 U.S. 563, 568 (1968). This inquires whether the state had an "adequate justification for treating the employee differently from any other member of the public based on the

---

[15] Factors germane to this inquiry may include "the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment." *Agyeman v. Roosevelt Union Free Sch. Dist.*, 254 F. Supp. 3d 524, 534 (E.D.N.Y. 2017) (citations omitted).

government's needs as an employer." *Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014)).

### C.  Analysis

Staple's motion for summary judgment argues that the evidence adduced in discovery unavoidably demonstrates that Alvarez's statements were made as a DOE employee, not as a citizen, and therefore do not enjoy First Amendment protection.

#### 1.  Official Responsibilities

The Court inquires whether Alvarez's statements fell within her official responsibilities. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Id.* at 173 (quoting *Garcetti*, 547 U.S. at 421). The inquiry whether a public employee speaks "pursuant to" her official duties is "a practical one." *Weintraub*, 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424). As the Supreme Court explained in *Garcetti*:

> Formal job descriptions bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

547 U.S. 424–25. Where an employee complains about her ability to "properly execute [her] duties," this speech falls within her official responsibilities. *Weintraub*, 593 F.3d at 203 (quotation marks omitted).

Here, Alvarez's job as Assistant Principal was very broad: By her own words, she was "responsible for having a 360 view of everything that happens in the building or in [her] school." Alvarez Dep. at 43. Particularly relevant to the speech at issue here, she also held the title "security liaison" for the Columbus Campus. *Id.* at 34. And, as part of her responsibilities,

Alvarez sat on the building safety committee, responsible for submitting periodic reports on the state of school safety. These were not mere on-paper duties: Alvarez attended weekly building principal meetings, Alvarez Dep. at 43, and submitted at least one safety report. Alvarez's job also involved routinely interacting with her school's safety personnel. These personnel had been trained and selected by the NYPD's specialized School Safety Division. Alvarez and these safety personnel regularly interacted regarding serious safety issues affecting students. *See* Alvarez Dep. at 40–42 (Q: "Were there ever NYPD officers of any type in the CIMS school? A: In the building, yes. In the Columbus complex building, yes. Q: When would that happen, is that a daily occurrence? A: Daily occurrence," *id.* at 41).

In light of these responsibilities, Alvarez's various expressions of concern about school safety reviewed above—whether those expressed in 2012, in her April 2013 letter to the DOE Chancellor, in the April 12, 2013 meeting that she and the other Columbus Campus principals held with Staple, or in March 2014 to the NYPD—all fell squarely within her job duties. And, contrary to Alvarez's claim, the Second Circuit's decision in *Matthews* does not avail her. Analogizing to *Matthews*, she urges that she "acted as a private citizen" when she spoke to the Chancellor and Staple about school safety because there "is no manual, no document listing, pinpointing that the specific issues complained about were part of the Principal's job responsibilities." Pl. Mem. at 12. *Matthews*, however, is far afield. There, Matthews, a line-level NYPD police officer, repeatedly reported an alleged quota system for stop-and-frisks and arrests to higher level officers. 779 F.3d at 169. The Second Circuit held that Matthews' reports fell outside his official responsibilities because Matthews "was not reporting suspected violations of law that might have required him to exercise his authority to arrest a fellow police officer [but instead] was voicing concerns about broad policy issues." *Id.* at 174–75. Because Matthews'

job was as a line officer rather than an NYPD policy-maker, his complaints regarding "broad policy issues" were not an integral part of his day-to-day job. *Id.*

By contrast, Alvarez's job as an acting principal was by definition broader and policy-centered. It included both policies and practices regarding safety on her campus. The weekly committee on which Alvarez sat was tasked with policy reports. And the complaints she made squarely concerned the safety of those (whether students or staff) within her school and the companion Columbus Campus schools. Indeed, Alvarez so characterizes the grievances she expressed. *See* Pl. Mem. at 11 (describing her complaints as having involved "students being arrested on campus without due process, arsons in the stairwell, death threats to Plaintiff's staff, and internal entities of the school not working together and putting student [sic] in danger etc.").

Further evidence that Alvarez's speech fell within her official responsibilities is that, by Alvarez's own account, her complaints arose from regular meetings of the Columbus Campus principals that covered safety concerns. *See* Alvarez Dep. at 144 ("Q: So were there any allegations or complaints that you made that these other four principals had no part in making? A: No."). This strongly indicates that the complaints by these public employees were "pursuant to [their] official duties" as opposed to individual acts of citizen expression, and that the five principals' in-tandem complaints were "part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties." *Weintraub*, 593 F.3d 203 (quotation marks omitted).

Alvarez has not pointed to any material facts—whether or not disputed—that support a different outcome. Construing the evidence in the light most favorable to Alvarez, it uniformly demonstrates that Alvarez's complaints about safety were made pursuant to her responsibility as a school principal for maintaining security at her school and the broader Columbus Campus.

## 2. Civilian Analogue

When a public employee speaks through "a form or channel of discourse available to non-employee citizens," *id.* at 204, her speech has a civilian analogue. Like an employee's job responsibilities, whether a civilian analogue exists bears on the role the speaker occupied when speaking: employee or citizen. *Id.* at 203–4. An employee's speech may be protected when made through a channel available to non-employee citizens even when the speech covered matters within her official responsibilities. The Supreme Court in *Garcetti* illustrated this point with two examples: a schoolteacher writing a letter to a newspaper, and co-workers talking about political issues. 547 U.S. at 422–23. In each instance, although the content of the employee's communications might pertain to an employee's duties, she could be reasonably held, on account of the channel in which she chose to speak, to have spoken primarily as a concerned citizen. In the same vein, when a public employee speaks "to an independent state agency responsible for entertaining complaints by any citizen in a democratic society regardless of his status as a public employee," that may indicate civilian speech. *Matthews*, 779 F.3d at 175 (quotation marks omitted).

Here, viewing the evidence in the light most favorable to Alvarez, she voiced her complaints about safety issues affecting CIMS and the other Columbus Campus schools to NYPD school-safety officials with responsibility for the area covered by the Columbus Campus; to the DOE deputy chancellor; and to her supervisor, Staple. Like Alvarez's job responsibilities, the internal administrative channels through which Alvarez and her fellow DOE principals chose to voice their coordinated complaints about Columbus Campus school safety strongly suggest employee, rather than citizen, speech.

Alvarez counters with two arguments. First, she claims that her speech was made to "outside agencies." Pl. Mem. at 14. Second, she again analogizes to *Matthews*, claiming that she spoke through "channels available to citizens generally." *Id.* at 15. Neither argument prevails.

As to the first argument, Alvarez's speech within the NYPD and DOE was directed at internal components of these agencies with which she and the other principals interacted as part of her job. Within the NYPD, Alvarez and her fellow Columbus Campus principals complained variously to members of the NYPD Department of Internal Affairs and the NYPD School Safety Division (Sgt. Albino, Lt. Silitides, XO Tally, Commanding Officer Quinn, and Ramon Garcia).[16] Within the DOE, she spoke to the Deputy Chancellor. Alvarez additionally claims that, within the DOE, she complained to the Office of Youth Development, the Office of Space and Planning, and the Office of Facilities. Alvarez, however, does not make any showing that these internal NYPD or DOE components were common outside fora for citizen grievances, *i.e.*, available to citizens generally, or that ordinary citizens commonly banded with school principals to articulate such grievances. Alvarez separately states that she made complaints about campus safety to CSA and New Visions for Public Schools "New Visions." Pl. Mem. at 13.[17] Alvarez

---

[16] Alvarez testified that she viewed the NYPD and the Office of Internal Affairs as effectively synonymous: "Q: And the NYPD and [O]ffice of Internal Affairs, are those the same thing? A: Yes. Well, they're different offices within the same unit. Q: What's the unit? A: The New York City Police Department. So, for example, if I had a threat and XO Tally felt maybe you should have a police car sent to take you home then it didn't happen through his office, it happened through the New York City Police Department office." Alvarez Dep. at 153.

[17] Alvarez additionally claims in her opposition brief that she complained to The Leadership Academy, Pl. Mem. at 13, but this statement is contradicted by her admitting to the factual allegations contained in Defendant's Rule 56.1 Statement that "Plaintiff did not share any complaints or concerns with the Leadership Academy, an educational non-profit, at any time," Pl. Counter 56.1 ¶ 14, as well as her deposition testimony, Alvarez Dep. at 152 ("Q: So there was no complaint to the Leadership Academy? A: No.").

Dep. at 152. However, New Visions, too, was effectively an internal DOE forum, as it had a contractual agreement to provide support to the DOE. *Id.* at 153. And as for CSA, Alvarez admits that she complained to CSA, her union, only after she had already been removed from her post as an acting principal. *Id.* at 152–53.

As to the second argument, the channels utilized by Alvarez to air grievances are far afield from those used by Matthews. In *Matthews*, the Second Circuit rejected the claim that Matthews had greater access to the commanding officers to whom he complained than an ordinary citizen. Those officers, the Circuit noted, regularly attended monthly community meetings at which any citizen could have aired grievances. *Matthews*, 779 F.3d at 176. Matthews met with and complained to his superior officers much like any member of the public. *Id.* Alvarez, in contrast, utilized fora that were disproportionately available to her on account of her status as a DOE acting principal. She drafted letters to DOE officials that were co-authored by four other principals from her campus. That was not an avenue available to members of the public. It was, however, available to Alvarez, because each principal in the group of five was responsible for the policies of her or his individual school, and met weekly with all Columbus Campus principals to discuss them. Alvarez adduces no evidence that the opportunity to band with other school principals to air common complaints was available to citizens who were not themselves DOE supervisors.

Alvarez's deposition testimony underscored that the grievance platforms that she chose derived from her status as an acting principal. She testified that the five principals copied Staple on most of their complaints, copying other DOE stakeholders, because "[w]e tried to be as transparent as possible because we wanted to make sure, I'll speak for myself, I wanted to make sure that people understood that I just wanted to run a good school, a healthy school." Alvarez

Dep. at 135. She thus tethered her choice of grievance method to her employment status within DOE. Her account also underscored the deliberate stratagem of acting collectively with other DOE principals. The principals' meeting with and letter to DOE's Deputy Chancellor was classically an internal grievance method. Alvarez does not identify any civilian analogue to this unusual mode of approach.

To be sure, as in *Weintraub*, "the lack of a citizen analogue is not dispositive in this case, [but] it does bear on the perspective of the speaker." 593 F.3d at 204. But here, the internal and stylized grievance procedure chosen by Alvarez reinforces the conclusion drawn from analysis of her job responsibilities. Both factors indicate that Alvarez complained about campus security in her capacity as an employee—an acting principal—rather than as a citizen.

Alvarez's case therefore resembles the many in which courts have held that teachers and school district personnel who complained about school district policies and procedures did so as employees performing professional duties. *See Agyeman v. Roosevelt Union Free Sch. Dist.*, 254 F. Supp. 3d 524, 535 (E.D.N.Y. 2017) (collecting cases and granting summary judgment to defendants, on ground that teacher who complained outside her chain of command within the DOE about her school's policies regarding disabled students spoke as public employee); *see also Harris v. Bd. of Educ.*, 230 F. Supp. 3d 88, 102 (E.D.N.Y. 2017) (dismissing First Amendment claim on ground that "[r]eporting a violation of state law to ensure the welfare of students is a duty of a teacher and in furtherance of the execution of one of her core duties" (quotation marks omitted)); *Ross v. New York City Dept. of Educ.*, 935 F. Supp. 2d 508 (E.D.N.Y. 2013) (granting summary judgment after finding physical education teacher's complaints to his union and OSHA about conditions of his gym not to be protected speech); *Massaro v. Dept. of Educ.*, No. 08 Civ. 10678 (LTS) (FM), 2011 WL 2207556, at *4 (S.D.N.Y. June 3, 2011) ("Classroom safety . . .

[is] part and parcel of a teacher's duties as a public employee and do[es] not enjoy First Amendment protection. . . . [C]ommunications . . . made as part of internal safety . . . reports . . . . are established [reporting channels] and used in connection with the public employment relationship and do not have a private citizen analogue." (citations omitted)).

## CONCLUSION

For the reasons above, the Court holds that, viewing the evidence in the light most favorable to Alvarez, the complaints about school safety that she claims were the impetus for retaliation by Staple were the speech of an employee pursuant to her official duties, not the protected speech of a citizen. The Court accordingly grants Staple's summary judgment motion and dismisses Alvarez's claim of retaliation under the First Amendment.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 57 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 26, 2018
New York, New York